*ewh*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JESSICA NAWROCKI, a minor, by )
BARBARA ESTRADA, her mother and )
next friend, and BARBARA ESTRADA, )
individually, )
)
    Plaintiffs, )
) Case No. 05 C 1466
    v. )
) Judge Mark Filip
THOMAS SCULLY, )
)
    Defendant. )

### MEMORANDUM OPINION AND ORDER

Jessica Nawrocki ("Nawrocki") and her mother, Barbara Estrada ("Estrada")

(collectively "Plaintiffs"), filed a complaint under 42 U.S.C. § 1983 in the Circuit Court

of Cook County against Thomas Scully ("Scully" or "Defendant"), Police Chief of the

Village of Crestwood, Illinois. Plaintiffs allege that they were arrested and detained

without cause in violation of their constitutional rights. (D.E. 1 ("Complaint").)[1] On

March 11, 2005, Scully filed a petition for removal of the case to federal court. (*Id.*) The

case is currently before the Court on Defendant's motions for summary judgment. (D.E.

23; D.E. 29.) For the reasons explained below, Defendant's motions for summary

judgment are granted in part and denied in part.

---

[1]     The docket entries in this case are designated as "D.E. __."

# I.    Background[2]

Ms. Nawrocki is Ms. Estrada's daughter, and she was thirteen at the time of the

incident in question. (Def. SF re Nawrocki ¶¶ 1, 9.) In 2003, Nawrocki and Estrada

resided in Dixmoor, Illinois. (Def. SF re Estrada ¶ 2.) Mr. Scully was the Chief of Police

in Crestwood, Illinois. *(See* Def. SF re Nawrocki ¶ 13.) The interactions between

Nawrocki, Estrada, and Scully arose in the course of an investigation by the Crestwood

Police Department into a shooting that occurred on July 12, 2003. (Def. SF re Estrada ¶¶

---

[2]     The Court takes the relevant facts from Defendant's Rule 56.1(a) statement of facts and
exhibits directed to Nawrocki ("Def. SF re Nawrocki) (D.E. 24); Defendant's Rule 56.1(a)
statement of facts and exhibits directed to Estrada ("Def. SF re Estrada) (D.E. 30); Nawrocki's
Rule 56.1(b)(3) response and Nawrocki's statement of additional facts and exhibits ("Nawrocki
Resp." or "Nawrocki SAF") (D.E. 32); Estrada's Rule 56.1(b)(3) response and Estrada's
statement of additional facts and exhibits ("Estrada Resp." or "Estrada SAF") (D.E. 35);
Defendant's Rule 56.1(b)(3)(B) responses to Estrada's statement of additional facts ("Def. Resp.
to Estrada") (D.E. 39); and Defendant's Rule 56.1(b)(3)(B) responses to Nawrocki's statement of
additional facts ("Def. Resp. to Nawrocki"). (D.E. 41.) Where the parties disagree over relevant
facts, the Court sets forth the competing versions. The Court resolves genuine factual disputes in
the respective Plaintiff's favor. *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004).

Local Rule 56.1 ("L.R. 56.1") requires that statements of facts contain allegations of
material fact, and the factual allegations must be supported by admissible record evidence. *See*
L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit
teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See,
e.g., Koszola v. Bd. of Ed. of City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v.
Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311,
1316 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion, or a
statement of fact without offering proper evidentiary support, the Court does not consider that
assertion. *See, e.g., Malec,* 191 F.R.D. at 583 ("[A] movant's 56.1(a) statement should contain
only factual allegations. It is inappropriate to allege legal conclusions."); *id.* ("Factual allegations
not properly supported by citation to the record are nullities."). Additionally, where a party
improperly denied a statement of fact by failing to provide adequate or proper record support, the
Court deems admitted the relevant statement of fact. *See* L.R. 56.1(a), (b)(3)(B); *Malec,* 191
F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific
evidentiary materials justifying denial, is equivalent to admission). The Court disregards any
additional statements of fact contained in a party's response rather than in its statement of
additional facts. *See Malec,* 191 F.R.D. at 584 (L.R. 56.1(b)(3)(B) statement is the only
acceptable means of presenting additional facts to Court).

Defendant has filed motions to strike certain paragraphs of both Nawrocki's and
Estrada's statements of fact. (D.E. 43; D.E. 45.) The Court addresses the motions to strike on a
paragraph by paragraph basis as relevant throughout the opinion.

22-25.) The police were investigating the possible involvement of Mark Carillo ("Carillo") in the shooting. (*Id.*) Carillo has been in and out of the penitentiary for approximately twelve years (*id.* ¶ 7), and Carillo was taken into custody on or about July 21, 2003, on an attempted first degree murder charge in connection with the shooting. (*See id.*, Ex. B ¶ 6; *id.*, Ex. F.) Ms. Estrada had known Carillo for many years; he was a regular visitor to her home in Dixmoor between 2001 and 2003, including daily visits in 2003 and times when he stayed at her home overnight. (Def. SF re Estrada ¶¶ 1, 4, 8-9.) Nawrocki also knew Carillo well—she refers to him as "Uncle Mark." (*Id.* ¶¶ 2, 4.)

From July 12 to July 22, 2003, Detective Neubauer ("Neubauer"), Detective Gomboz ("Gomboz"), and Scully proceeded with their investigation and made numerous visits to Nawrocki and Estrada at their residence in Dixmoor. (Def. SF re Estrada ¶¶ 22-23.) Neubauer and Gomboz repeatedly interviewed the mother and daughter about their contacts with Carillo and his possible location; Scully was present on at least two of these occasions. (*Id.* ¶¶ 23, 30, 48.) The detectives asked Estrada if she had had any contact, including telephone contact, with Carillo since the alleged shooting on July 12. (*Id.* ¶ 24.) Estrada responded to the detectives that she had not had contact with Carillo since the shooting. (*Id.*) (Both by Estrada's admission to Defendant's statement, and by her own account in her L.R. 56.1 statement of additional facts, this statement of hers to the police was false, in that she in fact had spoken with Carillo on the phone on the evening of the shooting, when they discussed it.) (*See* Def SF re Estrada ¶ 16 (detailing that, on the evening of July 12, 2003, Ms. Estrada asked Carillo, "Why are all the police by your house?" to which Carillo responded, "Eric [the individual who had been shot] told them I shot him"); Estrada SAF ¶ 2 (confirming phone conversation).) When the detectives

asked Estrada about Carillo's whereabouts, she denied knowledge of his location and directed them to various addresses and locations, including the residence of Carillo's ex-girlfriend. (Def. SF re Estrada ¶¶ 29, 48.[3])

During these visits, the detectives also spoke with Nawrocki and asked her if she had seen Carillo since the date of the shooting. (*Id.* ¶ 25.) Nawrocki told the detectives that Carillo had visited the Estrada residence between July 12 and July 22, 2003; Nawrocki also told the detectives that Carillo had eaten breakfast with Estrada at their residence. (*Id.* ¶ 26.[4])

Detectives Neubauer and Gomboz gathered other information in the course of their investigation into the shooting. Between July 12 and July 22, Neubauer and

---

[3] It appears undisputed that Carillo was not at any of these other locations, and given that fact, along with the other circumstances and facts discussed herein (such as the fact that Nawrocki's boyfriend told the police that he brought food to Carillo at an abandoned trailer some 200 feet from the Estrada/Nawrocki's trailer (Def. SF re Estrada ¶¶ 30-31)), the police could reasonably have concluded that Estrada was sending the police on a wild goose chase.

[4] In her Response, Ms. Estrada asserts that her daughter, Ms. Nawrocki, testified that she did not see Carillo during the time that the police were searching for him after the shooting, "except for a few brief moments the day of the shooting, when she and Mr. Carillo rode bicycles around the block." (Estrada Resp. at 1.) Irrespective of such alleged testimony, neither Plaintiff properly disputes the fact (which is supported by the affidavits of Crestwood Police Detective Theresa Neubauer (Def. SF re Estrada, Ex. A ¶ 13), and Crestwood Police Detective Steven Gomboz (*id.*, Ex. B ¶ 13)) that Nawrocki *told* the detectives that Carillo had eaten breakfast at her mother's residence during the relevant time period after the shooting. (If Plaintiffs wanted to dispute this fact, or felt they legitimately could, Ms. Nawrocki simply could have included such an assertion in an affidavit affixed to the Plaintiffs' papers responding to the summary judgment motions, as is commonly done in this district.) Nor does either Plaintiff dispute Police Chief Scully's testimony that both Detective Neubauer and Detective Gomboz told Scully that Ms. Nawrocki had informed them of Carillo's having eaten breakfast at Ms. Estrada's residence in the time period following the shooting. (*Id.*, Ex. C ¶ 9.) As a result, Ms. Estrada's notation of her daughter's testimony (*i.e.*, that she only saw Carillo once after the shooting), is inadequate to create a material disputed fact concerning the officers' testimony that Ms. Nawrocki so informed them of the Carillo/Estrada breakfast visit (irrespective of whether such a visit actually occurred). Although the existence of the breakfast visit is not material, in that the Court would independently find that the Defendant had probable cause to arrest Ms. Estrada for obstruction of justice for her provision of other false information, the Court nonetheless credits the assertion that Ms. Nawrocki told the detectives of the breakfast meeting, as that fact has been properly established within the framework established by Local Rule 56.1.

4

Gomboz interviewed Nawrocki's boyfriend, Anthony Robertson ("Robertson"). (Def. SF re Estrada ¶ 30.) Robertson informed the detectives that Carillo had stayed in a vacant trailer approximately 200 feet from Estrada's trailer in the Dixmoor site where she resided. (*Id.*) Robertson also told the detectives that he had brought food to Carillo while he stayed in the vacant trailer. (*Id.* ¶ 31.)

Carillo was taken into police custody on or about July 21, 2003. (Def. SF re Estrada ¶ 39.) Scully states that, based on Estrada's failure to answer the detective's questions honestly, he suspected that she knew where Carillo's gun was hidden. (*Id.* ¶ 45.)[5] Scully further states that he was concerned that if Estrada had access to the weapon, she might access it and might dispose of it. (*Id.* ¶ 46 & *id.*, Ex. Scully Dep. at 38.)

On the evening of July 22, 2003, two Crestwood police officers came to the Estrada residence to drive Plaintiffs to the police station (Def. SF re Nawrocki ¶ 9), and they informed the Plaintiffs that Defendant wanted to speak to them. (Estrada SAF ¶ 6.)[6] It is undisputed that Estrada and Nawrocki voluntarily went to the station with the two officers. (*Id.* ¶ 12.) The Plaintiffs disagree concerning when they arrived at the police station, but it was the nighttime, as Ms. Estrada puts the time as at least 7:00 p.m. (*id.* ¶ 7), and Ms. Nawrocki testified that it was approximately 11:00 p.m. (Def. Resp. to Nawrocki SAF, Ex. Nawrocki Dep. at 35.) Upon arriving at the station, Nawrocki and

---

[5] Estrada objects to Def. SF re Estrada ¶¶ 45 and 46 on the basis that they "express only what Defendant Scully contends were his subjective impressions and ideas, and are not facts . . . ." (Estrada Resp. at 2.) Estrada cites no evidence that would refute that Defendant held the beliefs expressed in the two paragraphs. Therefore, the Court will consider ¶¶ 45 and 46 as statements of Defendant's subjective belief.

[6] Defendant neither admits nor denies (nor moves to strike) the statement that the officers told Plaintiffs that Defendant wanted to speak with them. (*See* Def. Resp. to Estrada ¶ 6; D.E. 45 at 2.) Therefore, the Court deems the statement admitted.

Estrada were separated; Estrada was escorted into Scully's office with a female detective, while Nawrocki stayed in a hallway-like area outside. (Estrada SAF ¶ 7; Nawrocki SAF ¶ 5.)[7]

During the ensuing interrogation in his office, Scully repeatedly asked Estrada "where's the gun." (Estrada SAF ¶ 8 ("They wanted to know where 'the gun' was.").)[8] When Estrada replied that she did not know anything about a gun or where it might be, Estrada claims that Scully said that if she did not tell him where the gun was, the police would hold her in the Robbins jail ("Robbins Jail") until she did; Estrada further claims that Scully kept "asking about the gun." (*Id.* ¶¶ 9, 12.) Defendant denies making the threats regarding the Robbins Jail to Estrada. (Def. Resp. to Estrada ¶¶ 9, 12.)

While Nawrocki was waiting outside of Scully's office, she alleges that she could hear police yelling at her mother for about fifteen minutes and could hear the interview. (Nawrocki SAF ¶ 5.) Defendant denies yelling at Estrada. (Def. Resp to Nawrocki SAF ¶ 5.) Nawrocki asserts that she was crying because she knew her mother would be going to jail. (Nawrocki SAF ¶ 6.)

---

[7] Defendant has moved to strike Nawrocki's SAF ¶ 5 on the basis that it, along with ¶¶ 3-4 and 6-8 "contain[s] multiple assertions, a fair number of which amount to conclusions as opposed to factual assertions" and therefore violates L.R. 56.1(b)(3)(B). (D.E. 43 at 1-2.) While the cited paragraphs all contain multiple facts, they are presented in straightforward fashion, and the Court is within its discretion in electing to consider these paragraphs as offered by the Plaintiffs. In rejecting Defendants' motion to strike ¶¶ 3-8, the Court also notes that none of these paragraphs contains impermissible legal conclusions. Accordingly, Defendant's motion is denied.

Separately, Defendant has also denied ¶ 5 in its entirety. (Def. Resp. to Nawrocki ¶ 5.) Because the Court finds that the record evidence cited by Defendant does not refute that Estrada and Nawrocki were separated at the station, this fact is deemed admitted.

[8] The record evidence cited by Defendant does not support his denial of this statement. (*See* Def. Resp. to Estrada SAF ¶ 8.) Therefore, the Court deems the fact admitted.

6

Estrada came out of Scully's office crying, and then Nawrocki was escorted into the office. (*Id.* ¶ 6.)[9] Once in the office, Nawrocki states that she was crying because she knew her mother would be going to jail. (*Id.*) Scully asked Nawrocki if she knew where a gun was, and Nawrocki replied that she did not know. (*Id.*)

According to Nawrocki, Scully told her that he would call the Department of Children and Family Services ("DCFS") to come pick her up if she did not tell him where the gun was, and that she would never see her family again. (*Id.* ¶¶ 6, 7.) By Nawrocki's account, Scully went so far as to pick up a phone and say "I have a girl here. If you can't pick her up, I'll drop her off," and to tell her that she was going to the DCFS or the home for girls. (*Id.* ¶¶ 7, 8.) Nawrocki states that that call must have been a pretense, because DCFS never actually came. (*Id.* ¶ 9.)

Scully denies making any comments during the interrogation regarding sending Nawrocki to DCFS or any similar comments. (Def. Resp. to Nawrocki ¶¶ 7-9.) He provides the following account of his interaction with Nawrocki, which Nawrocki admits in her abbreviated response as "accurately stat[ing] the facts": Scully and a female officer spoke with Nawrocki for "five or ten minutes," during which time Scully "never threatened to place her under arrest or put her in jail." (Def. SF re Nawrocki ¶¶ 13, 14.) Nawrocki also admits that:

- She was not handcuffed, searched, or fingerprinted (*id.* ¶ 15);
- At the station, Nawrocki did not feel she was under arrest (*id.* ¶ 16); and
- She was never placed under arrest. (*Id.*)

---

[9]     As previously discussed, Defendant's motion to strike Nawrocki SAF ¶ 6 is denied. Further, because Defendant's response to ¶ 6 is nonresponsive and neither admits nor denies the stated fact (*see* Def. Resp. to Nawrocki ¶ 6), the Court deems the paragraph admitted.

(As previously related, Nawrocki also does not dispute that the officers who transported her and her mother to the station did not force them to go to the station (*id.* ¶ 10); that she and her mother "went voluntarily" to the police station (*id.* ¶ 12); and that after Nawrocki's five to ten minute conversation with Defendant and the female officer, another officer drove Nawrocki back to her home. (*Id.* ¶ 14).) At the time that the officer drove Nawrocki home, she was crying because she thought she would never see her mother again. (Nawrocki SAF ¶ 10.)

Ms. Estrada, Nawrocki's mother, was taken to Robbins Jail at 11:45 p.m. on July 22, after Estrada's interrogation. (Def. SF re Estrada, Ex. E (sign-in sheet for Estrada at Robbins Jail).)[10] During the afternoon of July 23, Estrada was taken from Robbins Jail to Scully's office where she signed a notification of rights form. (*See* Def. SF re Estrada ¶ 37; *id.*, Exs. D, E.) Estrada alleges, and Scully denies, that while she was in Scully's office, Scully again interrogated her regarding the gun. (Def. Resp. to Estrada ¶ 16.)[11] Taking the evidence and potential reasonable inferences from it in favor of Ms. Estrada, she was then returned to Robbins Jail and was ultimately released on July 25 at 12:25 a.m.—48 hours and 40 minutes after she was initially brought to the jail. (Def. SF re Estrada, Ex. E.)

---

[10]    Defendant alleges that Estrada was held at Robbins Jail for 24 hours. (*See* Def. SF re Estrada ¶ 38.) However, documentary evidence produced and cited by Defendant at least could be read to reflect or suggest that Estrada was held at the Robbins facility from 11:45 p.m. on July 22, to 12:25 a.m. on July 25—a total of 48 hours and 40 minutes. (*See id.*, Ex. E at 1-2 (sign in sheet for Estrada at Robbins Jail).)

[11]    Scully has moved to strike Estrada SAF ¶16. (D.E. 45 at 3.) This motion is denied for the same reasons stated in note 7, *supra*.

8

## II.    Standard of Review

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the respective nonmovant. *See* Fed. R. Civ. P. 56(c); *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

## III.    Analysis

Plaintiffs allege that Defendant violated their constitutional rights to be free from arrest and detention without cause, and consequently violated 42 U.S.C. § 1983. (D.E. 1.) Defendant moves for summary judgment against each Plaintiff on the grounds that he did not violate their constitutional rights. (*See* D.E. 29-2 at 6; D.E. 23-2 at 4.) Defendant also argues that he is entitled to qualified immunity. (*See* D.E. 29-2 at 7; D.E. 23-2 at 5.)

In this regard, "[p]olice officers are entitled to qualified immunity for actions taken during a stop or arrest insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001) (internal quotation marks and citation omitted). In determining whether an officer is entitled to qualified immunity,

9

"the first inquiry must be whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *accord, e.g., Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003). If no constitutional right has been violated, that is the end of the qualified immunity analysis. *See Saucier*, 533 U.S. at 201.

If a violation could be made out on the facts taken in the light most favorable to the plaintiff, the next step "is to ask whether the right was clearly established," namely "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Precedent teaches that it is "vital" that "[t]his inquiry . . . must be undertaken in light of the specific context of the case." *Id.* at 201. Moreover, "[o]nce a defendant has pleaded qualified immunity, the plaintiff has the burden to demonstrate the existence of the clearly established constitutional right." *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir. 1997) (citation omitted). "The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Id.* (internal quotation marks and citation omitted). In assessing qualified immunity in the context of summary judgment, the Seventh Circuit teaches that the nonmovant's version of disputed facts must be taken as true. *See, e.g., Payne*, 337 F.3d at 775 (collecting cases); *Morfin v. City of East Chicago*, 349 F.3d 989, 1000 n.13 (7th Cir. 2003). Precedent also makes clear that "the doctrine of qualified immunity leaves 'ample room for mistaken judgments' by police officers." *Payne*, 337 F.3d at 776 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

The Court finds that Defendant is entitled to summary judgment on the claim of false arrest against Estrada. However, there are material disputed issues of fact as to

10

whether Defendant committed an illegal detention of Estrada, which material factual disputes also affect the qualified immunity analysis, such that summary judgment is denied as to this claim. With regards to Nawrocki, the Court finds that she has not alleged a claim for a substantive due process violation in her complaint and thus cannot forestall summary judgment on such basis; moreover, the facts would not satisfy the demanding "shock the conscience" standard established in precedent to ground a substantive due process claim in any event. Finally, the undisputed facts support summary judgment for Defendant on Nawrocki's unlawful seizure claim—as she all but concedes before offering the substantive due process argument against summary judgment.

A. The Summary Judgment Motion Concerning Ms. Estrada's False Arrest Claim Is Granted But It Is Denied As To Her Claim For Subsequent Unlawful Detention

1. Estrada Has Given Defendant Fair Notice of Claims for False Arrest and Unlawful Detention

Defendant asserts that Ms. Estrada now seeks to advance claims and/or arguments that are not sufficiently pleaded in the Complaint. In this regard, the Court notes that Estrada sets forth arguments in her response memorandum relating to two putative claims against Defendant: 1) false arrest based on a lack of probable cause (D.E. 34 at 1-3); and 2) unlawful detention based on a failure to timely provide a probable cause hearing or otherwise present Estrada before a judicial officer. (*Id.* at 3-7.) In his reply brief, Scully argues that Estrada should not be allowed to assert her second claim of unlawful detention because this is "an entirely new theory that was not even alluded to in the pleadings." (D.E. 47-1 at 1-2.) The Court respectfully rejects Scully's argument and

finds that the Complaint provided him with sufficient notice of Estrada's claim for unlawful detention under the Fourth Amendment.

Pursuant to Fed. R. Civ. P. 8, the Complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* The Seventh Circuit has emphasized that this is not a particularly demanding standard, and it does not require a litigant to provide a detailed pleading as opposed to notice of what the putative claim is. *See Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) (collecting cases); *accord, e.g.*, *Beanstalk Group, Inc. v. AM Gen. Corp.*, 283 F.3d 856, 863 (7th Cir. 2002) (stating that Rule 8 "require[s] that a complaint only give notice of the plaintiff's claim.") (collecting cases).

The Complaint alleges that on July 22, 2003:

2.      . . . [T]he defendant arrested both plaintiffs and held them against their will at the Crestwood police station and Robbins jail.

3.      Said arrests and detention were made without the authority of an arrest warrant and without probable cause on the part of the defendant to affect the arrests.

4.      The arrest and detention of the plaintiffs without cause was done by the defendant under color of state law, was in violation of the rights secured to the plaintiffs by the constitution of the United States of America, and is made actionable by Title 42 U.S.C. § 1983.

(D.E. 1 at 5.) In a previously filed motion to dismiss in this case, Defendant Scully asserted that the Complaint did not identify with any specificity a constitutional right allegedly violated. (D.E. 9.) The Court denied the motion to dismiss, stating that "the Plaintiffs in this case have alleged violations of, at a minimum, the Fourth Amendment, as incorporated through the Fourteenth Amendment, of the United States Constitution." (D.E. 12.) The Court found then, as it does now, that the Complaint states putative

12

claims for violations of the Fourth Amendment. In particular, the Complaint's use of the terms "arrest," "detention," and "without probable cause," as well as the reference to both the Crestwood police station and Robbins Jail, provide sufficient notice to Defendant that Estrada might pursue claims for two Fourth Amendment violations—arrest without probable cause and unlawful detention. *See, e.g., Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002) (holding that defendant had sufficient notice where the Section 1983 plaintiff who was pleading conspiracy indicated the parties, general purpose and approximate date of the conspiracy, and further detailing the limited pleading requirements of Fed. R. Civ. P. 8).

Moreover, Defendant's own filings suggest that he was not unfairly surprised by Estrada's unlawful detention claim. One of the facts that Defendant included in his L.R. 56.1 statement states that "Estrada was held at the Robbins, Illinois lock-up for 24 hours." (*See* Def. SF re Estrada ¶ 38; *see, e.g.,* D.E. 29-2 at 8 ("A reasonable officer in Thomas Scully's position could have believed that probable cause existed to hold Estrada for 24 hours before deciding whether to charge her . . . .").) Although, as explained further below, the documents which Defendant offers in support of this position fairly could be read to indicate that Ms. Estrada was held for a substantially longer period of time (and one over forty-eight hours), Defendant appears to have taken cognizance of the potential relevance of the duration-of-detention issue in the context of the pending Fourth Amendment claim. For all of these reasons, the Court concludes that the Complaint provided Defendant sufficient notice of Estrada's claim for unlawful detention under Fed. R. Civ. P. 8(a). Accordingly, the Court will consider the claim below, although the Court will first address the merits of Estrada's threshold false arrest claim.

13

2. Ms. Estrada's False Arrest Claim Fails Because There Was Probable Cause For Her Arrest

Defendant moves for summary judgment on Estrada's threshold false arrest claim on the grounds that there was probable cause to arrest her, and therefore, he did not violate her Fourth Amendment rights via the arrest.[12] The Court agrees and grants Defendant's motion for summary judgment as to the false arrest claim.

Precedent establishes that the existence of probable cause would constitute an "absolute bar" to Estrada's Section 1983 false arrest claim. *Fernandez v. Perez*, 937 F.2d 368, 370 (7th Cir. 1991) (citing *Friedman v. Vill. of Skokie*, 763 F.2d 236, 239 (7th Cir.1985)); *accord, e.g., Potts v. City of Lafayette, Ind.*, 121 F.3d 1106, 1113 (7th Cir. 1997) (collecting cases). Precedent further teaches that "[p]robable cause . . . does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (citation omitted). Instead, "[s]o long as the totality of the circumstances, viewed in a common sense manner, reveals a . . . substantial chance of criminal activity on the suspect's part, probable cause exists." *Id.* (collecting cases).

The Court evaluates probable cause "not on the facts as an omniscient observer would perceive them, but on the facts as they would have appeared to a reasonable person in the position of the arresting officer. . . ." *Booker v. Ward*, 94 F.3d 1052, 1057-58 (7th

---

[12]     In one of his L.R. 56.1 statements, Defendant asserts that Estrada was not arrested, a fact which Estrada denies. (Def. SF re Estrada ¶ 33; Estrada Resp. ¶ 33.) However, throughout his briefing, Defendant vacillates between claiming that Estrada was merely "detained" or "held" (*see, e.g.*, D.E. 29-2 at 4-5) and conceding that Estrada was in fact arrested. (*See, e.g.*, D.E. 47-1 at 4 ("Unlike the arrestee in *Haymer*, Estrada was arrested <u>after</u> Defendant determined that she had misled the detectives and thus committed the offense of obstructing justice.") (emphasis in Defendant's filing).) Moreover, in defending against Estrada's claim of false arrest, Defendant relies on case law concerning the standard for probable cause to arrest. (*See, e.g.*, D.E. 29-2 at 2.) Therefore, the Court will address the issue as the parties have framed it—*i.e.*, whether Defendant's arrest of Estrada was based on probable cause.

14

Cir. 1996) (emphasis omitted) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992)). "So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *Mounts*, 248 F.3d at 715 (citation omitted); *accord United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000) (citation omitted). Probable cause is determined by a standard of objective reasonableness. *Graham v. Conner*, 490 U.S. 386, 388 (1989); *accord Potts*, 121 F.3d at 1113 (citation omitted). In assessing the propriety of an arrest, the arrest is proper so long as the collective knowledge of the investigating agency is sufficient to ground probable cause. *See Tangwell v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) (collecting cases and discussing the Seventh Circuit's "long-standing recognition of the 'collective knowledge doctrine'"); *accord, e.g., United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) (collecting cases).

Defendant maintains that there was probable cause to arrest Estrada for obstruction of justice, a violation of Illinois criminal law. (D.E. 29 at 5.)[13] He is correct.

Under Illinois law:

A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he knowingly commits any of the following acts.

(a) Destroys, alters, conceals or disguises physical evidence . . . [or] furnishes false information . . . .

720 ILCS 5/31-4 (2006). In the instant case, the elements of obstruction of justice were that: 1) Estrada knowingly furnished false information to the police; and 2) the false

---

[13]     Defendant also states that Ms. Estrada was held because she "may have also aided and abetted a fugitive." (*See, e.g.*, D.E. 47-1 at 5; Def. SF re Estrada ¶ 34.) That may well be true. However, while this putative reason may provide another, alternative basis to support the arrest, the Court need not reach this question, as Defendant had probable cause to arrest Ms. Estrada for obstruction of justice, as explained herein.

15

information was furnished with the intent to prevent the apprehension or obstruct the prosecution of Carillo. *See People v. Childs*, 651 N.E.2d 252, 254 (Ill. App. Ct. 1995) (affirming conviction for obstruction of justice) (citation omitted). As to the latter element, Illinois precedent teaches that "[s]tate of mind or intent need not be proved by direct evidence, but can be inferred from the proof of surrounding circumstances." *People v. Jackiewicz*, 517 N.E.2d 316, 318 (Ill. App. Ct. 1987) (collecting cases).

Considering only the facts undisputed by Plaintiffs, and within the collective knowledge of the Crestwood Police Department, the Court concludes that there was probable cause to arrest Estrada for obstruction of justice. *See, e.g., Potts*, 121 F.3d at 1113 (affirming district court's decision that probable cause existed as a matter of law where there were no disputed material facts underlying the probable cause determination); *accord, e.g., Booker*, 94 F.3d at 1058 (affirming grant of summary judgment to defendant officers on Section 1983 claim based on finding of probable cause). First, the totality of the circumstances led to a reasonable belief that Estrada had furnished false information to the detectives. Estrada had falsely denied having contact with Carillo, including phone contact (Def. SF re Estrada ¶ 24), notwithstanding that it is undisputed that Estrada in fact had spoken to Carillo by telephone after the shooting, during which call she asked Carillo why the police were by his house and Carillo related that the individual who had been shot had said that Carillo was the shooter. (*Id.* ¶ 16; Estrada SAF ¶ 2.) In addition, although not necessary to the result in this case, Estrada also did not tell the detectives that Carillo had been at the house and eaten breakfast there with Estrada—a fact that Nawrocki had related to the detectives in a conversation with them (*see, e.g.*, note 4, *supra* (discussing D.E. 30, Ex. A ¶ 13; id., Ex. B ¶ 13; Ex. C ¶ 9)),

16

even if she were mistaken for some reason. Estrada also was less than forthcoming with the detectives when she failed to tell them that Nawrocki had seen Carillo on the day of the shooting (information the police learned from Nawrocki herself). (Def. SF re Estrada ¶ 28.) Estrada told the detectives that she had not had contact with Carillo since the shooting (which was false); that she had no idea of his whereabouts; and she suggested that the detectives should check various addresses, including his ex-girlfriend's address (which addresses proved unavailing). (Def. SF re Estrada ¶¶ 24, 29.) In addition, during the period between July 12 and 22, 2003, Detectives Neubauer and Gomboz interviewed Ms. Nawrocki's boyfriend, Robertson, who informed the detectives that Mr. Carillo had stayed in a trailer located approximately 200 feet from Ms. Estrada's trailer and that Robertson had brought food to Carillo while he stayed in the vacant trailer. (*Id.* ¶¶ 30-31.)[14]

All of this information amply supports the conclusion that there was probable cause to arrest Ms. Estrada for obstruction of justice. She falsely denied having spoken to Carillo (a fact she does not even deny). In addition, and independently, her daughter had stated that Carillo had eaten breakfast with Estrada at her trailer during the relevant time period. And, her daughter's boyfriend admitted to bringing food to Carillo in an abandoned trailer just 200 feet from Estrada's during the time period when Estrada said she was unaware of his location and suggested various other locations (which suggestions proved fruitless for the police searching for Carillo).

---

[14] Plaintiff claims that Defendant's arrest was an impermissible "investigatory arrest." (D.E. 34 at 3 (citing *People v. Haymer*, 506 N.E.2d 1378, 1384 (Ill. App. Ct. 1987)).) However, facts supporting a probable cause assessment to arrest for obstruction of justice were known to Defendant before Plaintiff was arrested. Thus, the instant case can be distinguished from cases such as *Haymer*, where law enforcement officers arrested a suspect for the purpose of "conducting an expedition for evidence in hope of obtaining information upon which to predicate probable cause to justify an arrest." *Haymer*, 506 N.E.2d at 1384.

The first false statement (*i.e.*, Estrada's denial of having spoken to Carillo, when she had done so) alone is sufficient evidence to establish probable cause that Estrada committed a crime. *See* 720 ILCS 5/31-4 (2006) (a person who "furnishes false information" to the police with intent to prevent the "apprehension" or "prosecution" of any person constitutes obstruction of justice under Illinois law). Moreover, the statement from Nawrocki that Carillo had eaten breakfast with Estrada at her trailer also independently supports a probable cause finding to arrest Estrada for obstruction of justice. Nawrocki's statement may have been mistaken or even false, but the police had no reason to doubt Nawrocki's statement on this score, given the extensive undisputed evidence in the record about the closeness of the relationship between Estrada and Carillo, and about Nawrocki's fondness for Carillo as well. *See, e.g., Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003) ("The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate.") (collecting cases); *accord, e.g., Smith*, 321 F.3d at 685 ("[W]hen a police officer receives information sufficient to raise a substantial chance of criminal activity from a person whose truthfulness he has no reason to doubt, that information is sufficient to establish probable cause.") (citation omitted). Finally, Robertson's statement, in which he admitted to taking food to Carillo in an abandoned trailer just 200 feet from Estrada's, during a period of time when Estrada denied knowing of Carillo's whereabouts and sent the police on what certainly could have appeared to be a willful wild goose chase, also would independently support a probable cause finding. Again, precedent teaches that the requisite evidence to support a probable cause finding is

not proof beyond a reasonable doubt or even proof to a preponderance; Robertson's statement, along with all of the surrounding circumstances and the close relationship between Estrada and Carillo (Estrada considers him a "good friend," and he has "stayed overnight at Estrada's residence on numerous occasions" and is a "regular visitor" there (Def. SF re Estrada ¶¶ 6, 8, 9)), all would support a reasonable inference that there was a "substantial chance" that Estrada had been obstructing justice in her statements to the police while they were trying to locate Carillo. *Mounts*, 248 F.3d at 715.

In addition, the police could reasonably find probable cause to believe that Estrada intended to obstruct the apprehension and/or the prosecution of Carillo. *See Childs*, 651 N.E.2d at 255 (finding that circumstantial evidence supported the jury's determination that defendant had lied to officers to protect a suspect). Intent could be inferred from the fact that Estrada had a close relationship with Carillo, and that Estrada made false and/or suspicious statements about Carillo's location and Estrada's interactions with him during the relevant time period when the police were searching for Carillo in the wake of the shooting and before he was charged with attempted first degree murder. *See, e.g., Jackiewicz*, 517 N.E.2d at 1066 (inferring intent to obstruct where the suspect was the defendant's brother, and the defendant had shown an interest in protecting his brother). Thus, the Court concludes that, under the totality of the circumstances, an officer in Defendant's situation would reasonably have believed that there was a substantial chance Estrada had committed, or was committing, obstruction of justice. *See, e.g., Smith*, 321 F.3d at 685. As a result, Estrada's false arrest claim against Defendant fails.

Moreover, even if the Court concluded that Defendant lacked probable cause to arrest Estrada for obstruction of justice, Defendant would be entitled to qualified immunity. *See, e.g., Tibbs v. City of Chicago,* No. 02 C 2970, 2005 WL 326982, at *4 (N.D. Ill. Feb. 8, 2005) (Moran, J.) (finding that defendant officer would be entitled to qualified immunity on false arrest claim even if he did not have probable cause to arrest plaintiff). A reasonable officer in Defendant's situation could have mistakenly believed that, for example, the statements from Robertson about Carillo's "hideout" location near Estrada's residence, Estrada's lack of candor about Nawrocki's contact with Carillo, Estrada's false denial of having had contact with Carillo, and Estrada's close relationship with Carillo, provided probable cause to arrest Estrada for obstruction. *See Saucier,* 533 U.S. at 206 (discussing *Anderson v. Creighton,* 483 U.S. 635 (1987), and stating that even where a court concluded that an officer lacked probable cause "*Anderson* still operates to grant officer's immunity for reasonable mistakes as to the legality of their actions."); *accord, e.g., Wollin v. Gondert,* 192 F.3d 616, 625-26 (7th Cir. 1999) (applying summary judgment analysis and holding that defendant deputies were entitled to qualified immunity because they could have reasonably believed that probable cause existed to arrest plaintiff).

Because Defendant had probable cause to arrest Estrada for obstruction of justice, no cause of action for false arrest under Section 1983 will lie. *Accord, e.g., Potts,* 121 F.3d at 1113. Defendant would be entitled to qualified immunity in any event. Accordingly, the Court grants Defendant summary judgment on Estrada's claim of false arrest.

3. Summary Judgment Is Not Warranted on Estrada's Claim of a Subsequent Unlawful Detention

Defendant moves for summary judgment on Estrada's unlawful detention claim on the grounds that Estrada was detained for less than 48 hours at Robbins Jail, and therefore, he did not violate Estrada's Fourth Amendment rights. (*See* D.E. 47-1 at 4.) The Court respectfully denies summary judgment as to this claim because of disputed and/or unresolved factual questions related to the claim.

The question of whether a post-arrest detention satisfies constitutional requirements is not necessarily answered by a finding that there was probable cause to arrest. *See Sivard v. Pulaski County*, 959 F.2d 662, 665 (7th Cir. 1992) (concluding that the fact that the warrantless arrest of plaintiff was supported by probable cause did not preclude a Section 1983 claim for extended detention after the arrest). The Supreme Court held in *Gerstein v. Pugh*, 420 U.S. 103 (1975) that "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* at 114; *accord, e.g., Bostic v. City of Chicago*, 981 F.2d 965, 967 (7th Cir. 1993). More recently, the Supreme Court articulated that a detention of 48 hours or less prior to an appearance before a judicial officer will generally comply with the Fourth Amendment's requirement of promptness. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *accord, e.g., Kyle v. Patterson*, 196 F.3d 695, 696 (7th Cir. 1999) ("The law requires a 'prompt' judicial determination of probable cause after a person is taken into custody. As a general matter, 'prompt' in this context means within 48 hours.") (citing *Gerstein* and *County of Riverside*, *supra*).

In this regard, the Supreme Court has instructed that "[w]here an arrested individual does not receive a probable cause hearing within 48 hours," the burden is on

21

the government to explain why the delay in bringing the defendant before a neutral magistrate was reasonable or necessary. *County of Riverside*, 500 U.S. at 57; *accord, e.g., Sivard*, 959 F.2d at 666. In that situation, "the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *County of Riverside*, 500 U.S. at 57; *accord, e.g., Sivard*, 959 F.2d at 666.

As discussed above, the log from Robbins Jail, submitted by Defendant, could be reasonably interpreted by a jury to show that Estrada was detained there for at least 48 hours and 40 minutes. (Def. SF re Estrada, Ex. E.) In addition, prior to being held at Robbins Jail, Estrada asserts that she was interrogated at the Crestwood police station starting around 7:30 p.m. (Estrada SAF ¶ 7.) The facts as stated by Estrada thus could be interpreted to support the idea that Estrada was detained without having a probable cause hearing for somewhere between 48 hours and 40 minutes up to some 53 hours.

Precedent teaches that because Estrada was held for more than 48 hours without a probable cause hearing, Defendant must justify the detention by showing the existence of an emergency or other exceptional circumstance. *See Sivard*, 959 F.2d at 666. Defendant's summary judgment papers, at least, do not discharge that burden. *Accord, e.g., Hallstrom*, 991 F.2d at 1480 (finding that defendant officers failed to establish that an emergency or extraordinary circumstances accounted for a 79-hour delay before the plaintiff was taken before a magistrate); *see also County of Riverside*, 500 U.S. at 56 (discussing burdens on government and reasons that would not justify delay).[15]

---

[15]     In her brief, Estrada asserts that "she is not only entitled to the denial of defendant's summary judgment motion, but to a directed verdict in her favor on the issue of liability." (D.E. 34 at 5.) However, Estrada has not properly moved for summary judgment or filed the appropriate papers in support of such a motion, so the Court will not consider adjudicating the

22

The Court also concludes that Defendant is not entitled to qualified immunity for Estrada's claim of unlawful detention, at least on the basis of the papers submitted. The bulk of Defendant's argument is predicated on the factual assertion that Estrada was only held for 24 hours or less (D.E. 47 at 4), in which case *County of Riverside* would presumptively find no violation; and Defendant's argument that this claim was not fairly raised by the Complaint. (*Id.* at 2-3). However, as explained above, the claim was fairly raised under applicable standards in the Complaint; in addition, the evidence and testimony in the case could reasonably be read to support the idea that Estrada was held for a much longer (and presumptively unlawful) period of time without being taken before a judicial officer than Defendant contends.

The fact that the detention (reading the evidence and all reasonable inferences from it in Ms. Estrada's favor) extended beyond the presumptively reasonable 48-hour period also would have made it obvious to a reasonable officer that detaining Estrada in the manner that she was held was presumptively unlawful. *See Sivard*, 959 F.2d at 666; *see also Saucier*, 533 U.S. at 201-202. Furthermore, to the extent that Defendant has offered a reason for the continued detention to this point (*see* Def. SF re Estrada ¶ 34) such reason does not establish the applicability of qualified immunity, as *County of Riverside* instructed that a delay for further investigation "for the purpose of gathering additional evidence to justify the arrest" is not a permissible one. *See id.*, 500 U.S. at 56; *see also Llaguno v. Mingey*, 763 F.2d 1560, 1568 (7th Cir. 1985) (en banc) (describing "imprisonment on suspicion, while the police look for evidence to confirm their suspicion" as "an element alien to our system"), *abrogated on other grounds by County*

---

claim via a summary disposition. Failure to file the appropriate papers has deprived the parties and the Court of the chance to have the relevant factual issues squarely framed in support of any claim by Estrada that she is entitled to summary judgment on liability.

23

*of Riverside*, 500 U.S. at 56 (holding that any delay less than 48 hours is presumptively reasonable). At least on the basis of the record presented, and applying the applicable summary judgment standards, Defendant's request for summary judgment on grounds of qualified immunity is not persuasive. Therefore, the Court denies Defendant's motion for summary judgment on Estrada's claim of unlawful detention.

B. Nawrocki's Claims Are Properly Subject to Summary Judgment In Favor of Defendant

1. A Putative Substantive Due Process Claim Fails For Multiple, Independent Reasons

In the operative complaint, and as explained further below, Ms. Nawrocki does not assert, adumbrate, or even suggest any substantive due process claim. Reading the complaint generously, Ms. Nawrocki asserts a violation of the Fourth Amendment. (*See, e.g.*, D.E. 23, Ex. A at 1 (complaining of Plaintiffs' "arrests and detention . . . made without the authority of an arrest warrant and without probable cause").)

In her papers, and as explained further below, Ms. Nawrocki makes various concessions that fatally undermine any Fourth Amendment claim; therefore, Ms. Nawrocki all but abandons that claim in her summary judgment brief. Instead, Ms. Nawrocki asserts that Defendant's argument in support of summary judgment against her Fourth Amendment claim "misses the point" because Nawrocki's "claim is not as much for her wrongful detention as for the brutality of defendant's interrogation of a 13-year-old child." (D.E. 33 at 4.) Nawrocki then raises arguments that suggest that she is claiming a violation of her Fourteenth Amendment right to substantive due process. (*See id.* at 4-5 (analogizing facts of instant case to a substantive due process case from the

District of Maine).) For the reasons explained further below, any putative substantive due process claim is unavailing for multiple, independent reasons.

> a. The Complaint Does Not Plead or Give Any Fair Notice of a Substantive Due Process Claim

As discussed in greater detail above, the federal pleading rules "require that a complaint only give notice of the plaintiff's claim." *Beanstalk Group, Inc.*, 283 F.3d at 863 (collecting cases). Precedent teaches that the Due Process Clause of the Fourteenth Amendment protects individuals against state action that is so malicious and egregious that it "shocks the conscience." *See, e.g., County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1996) (teaching that "the substantive component of the Due Process Clause is violated by executive action only when it properly can be characterized as arbitrary, or conscience shocking, in a constitutional sense.") (internal quotation marks and citation omitted; collecting cases). The Seventh Circuit has articulated the particular requirements for Nawrocki's putative substantive due process claim under the Fourteenth Amendment: "a plaintiff [must] show misconduct that a reasonable person would find so beyond the norm of proper police procedure as to shock the conscience, and that is calculated to induce not merely momentary fear or anxiety, but severe mental suffering, in the plaintiff." *Barnhill v. Doiron*, 958 F.2d 200 (7th Cir. 1992) (internal quotation marks and citation omitted).

The Complaint does not provide notice of such a claim. The barebones allegations, which address only "arres[t] and detention . . . made without the authority of an arrest warrant and without probable cause," do not state a claim relating to Nawrocki's interrogation or to a violation of her substantive due process rights. Moreover, Nawrocki has not sought leave to file an amended complaint—a request that, under applicable

25

precedent, would not be well taken in any event given the posture of the case, in which discovery has concluded and another party has filed a summary judgment motion. *See, e.g., Hindo v. Univ. of Health Sciences/The Chicago Med'l School*, 65 F.3d 608, 615 (7th Cir. 1995) (citing *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 774 (7th Cir. 1995)). Because Ms. Nawrocki has not pleaded any substantive due process claim, nor sought leave to amend so as to advance such a claim, she cannot avoid summary judgment on such basis.

> b. A Substantive Due Process Claim Would Fail To Meet The Demanding Standards Applicable To Such A Claim In Any Event

Assuming *arguendo* that Ms. Nawrocki had actually advanced a substantive due process claim in her Complaint (which she has not), the interrogation that she underwent does not cross the high threshold required to sustain a substantive due process claim. *See, e.g., County of Sacramento v. Lewis*, 523 U.S. at 847. Ms. Nawrocki admits that she was interrogated for only five to ten minutes by Defendant in the presence of a female officer. (Def. SF re Nawrocki ¶¶ 13, 14.) The alleged threats that Nawrocki would never see her family again, along with the accompanying fake telephone call to DCFS, were surely harsh, especially in light of Nawrocki's young age. However, the threats were few in number, short in duration, and made without any accompanying threats to Nawrocki's bodily integrity, and they fall outside the level of severity that courts have required to ground any successful substantive due process claim of this sort. *See, e.g., Tinker v. Beasley*, 429 F.3d 1324, 1326 (11th Cir. 2005) (rejecting claim that police violated plaintiff's substantive due process rights in a multi-day interrogation in which they told her, *inter alia*, that her lawyer had "bailed out" on her, that she would never see her children again unless she confessed, and that she had two options—the electric chair or

life in prison—where plaintiff was innocent of any crime); *Sheets v. Butera*, 389 F.3d 772, 778-79 (8th Cir. 2004) (rejecting allegation that police violated plaintiff's substantive due process rights by coercing his confession to murder, notwithstanding plaintiff's innocence); *Pittsley v. Warish*, 927 F.2d 3, 7-8 (1st Cir. 1991) (holding that police did not violate four- and ten-year old children's substantive due process rights when officers told the children that if the police ever saw their father on the street, "you'll never see him again" and later, when arresting their father, directed vulgar language towards the children in refusing their request to hug and kiss their father goodbye).

Moreover, although not material in any sort of outcome-determinative sense, the Court also notes that the focus of the aggressive interrogation was on a salutary purpose—recovery of a firearm that had been recently used, at least allegedly, in an attempted first-degree murder by Mark Carillo. (Def. SF re Nawrocki ¶¶ 2, 4.) It was hardly irrational to think that Ms. Nawrocki might have access to the gun or that it might fall into her hands: the police had already learned, for example, that Ms. Nawrocki's boyfriend had taken food to Carillo after the shooting in an abandoned trailer near the unit where Ms. Nawrocki lived with her mother, and Nawrocki was sufficiently close to Carillo by virtue of her mother's friendship with him that Nawrocki regarded Carillo as her "uncle." The police therefore could reasonably conclude (or fear) that Ms. Nawrocki or her boyfriend would be in a position where they too would be exposed to or come across the firearm. Any reasonable police officer would appreciate the danger and harm that might potentially befall Ms. Nawrocki, her boyfriend, or perhaps others if one of them came across the gun and were unable to (or disinclined to) safely handle the gun and/or turn it in to authorities. Thus, while one might certainly argue Defendant's

27

aggressive interrogation of Ms. Nawrocki concerning the gun was overbearing or
excessive, and while it is unfortunate that the questioning and experience of having her
mother incarcerated understandably caused Ms. Nawrocki anguish, it is clear that the
interrogation was attempting to address real and substantial dangers concerning the
location of the gun.

The principal case Nawrocki offers in support of her substantive due process
argument is *Grendell v. Gillway*, 974 F. Supp. 46 (D. Me. 1997). However, that district
court decision is factually distinguishable. In *Grendell*, the defendant officers were
denied summary judgment based on their alleged "lying to and threatening of an eleven
year old girl . . . . in order to force her to incriminate her parents." *Id.* at 51. Notably, the
district court in *Grendell* stated that the First Circuit had "never held verbal threats or
harassment to constitute conscience-shocking behavior." *Id.* at 52. What the district
court found particularly abhorrent, however, and what it asserted distinguished *Grendell*
from prior unsuccessful substantive due process cases involving solely verbal harassment
by the police, was that the officer "threatened [the plaintiff] in such a way as to turn her
into an unwilling informant against her own parents." *Id.* Defendant's alleged threats did
not go nearly so far, and so Nawrocki's arguments under *Grendall* are unavailing.

In addition, and independently, subsequent precedent, including First Circuit
precedent which obviously controls over *Grendell*, renders any "lesson" from *Grendell*
sufficiently ambiguous that Nawrocki has not refuted Defendant's qualified immunity
defense. Specifically, in *Pittsley*, the First Circuit rejected a substantive due process
claim brought on behalf of four and ten year-old children who were allegedly subjected to
abusive and/or improper police tactics. The police allegedly told these children, when the

28

children answered the door of their home and no adults were present, that if the police saw the children's father on the street, "you'll never see him again." *Id.*, 927 F.2d at 5. Later, when the children were present for their father's arrest, the police directed vulgar language towards the children in rejecting their request to hug and kiss their dad goodbye. *Id.* In rejecting the substantive due process claim of the children, the First Circuit collected extensive precedent and stated that "[f]ear or emotional injury which results solely from verbal harassment or idle threats is generally not sufficient" to constitute a substantive due process violation. *Id.* at 7. Other circuit precedent also defeats Nawrocki's argument that qualified immunity should be rejected because Defendant's alleged statements during Nawrocki's questioning were clearly unconstitutional under the district court opinion in *Grendell. See, e.g., Tinker*, 429 F.3d at 1326; *Sheets*, 389 F.3d at 778-79.[16]

It is well settled that: (1) "the doctrine of qualified immunity leaves 'ample room for mistaken judgments' by police officers," *Payne*, 337 F.3d at 776 (quoting *Malley*, 475 U.S. at 343); and (2) qualified immunity applies unless a "right was clearly established," with that analysis being undertaken "in light of the specific context of the case." *Saucier*, 533 U.S. at 201. Nawrocki's citation of the district court opinion in *Grendell* is, with all respect, inadequate to defeat Defendant's qualified immunity claim—both because *Grendell* is factually distinguishable and because the teaching of other precedents (including an appellate precedent from the federal circuit court above the district court that issued *Grendell*) would not support relief on any substantive due process claim.

---

[16]    It is not improper for Nawrocki to offer a district court decision to attempt to defeat Defendant's qualified immunity argument, but it is equally fair to look at other caselaw to see if the single case offered by Nawrocki accurately and fairly would provide notice of unconstitutional behavior to a police officer. *See, e.g., Denius v. Dunlap*, 209 F.3d 944, 951 (7th Cir. 2000).

Accordingly, for each of the multiple, independent reasons stated above, summary judgment is warranted against any putative substantive due process claim of Ms. Nawrocki.

2. Summary Judgment Is Warranted Against Any Fourth Amendment Claim of Ms. Nawrocki

Defendant has moved for summary judgment on Nawrocki's Fourth Amendment claim on multiple bases, including that he did not seize Nawrocki, that the seizure was not unreasonable, and that he is entitled to qualified immunity for any unlawful seizure. *(See* D.E. 23.) As previously indicated, Nawrocki has made a variety of factual admissions that are inconsistent with a Fourth Amendment claim, admissions which almost certainly led her to effectively abandon the Fourth Amendment claim and attempt to argue a substantive due process theory instead. Nonetheless, in the interests of completeness, the Court briefly addresses the Fourth Amendment claim and explains why summary judgment on it is warranted.

First, Nawrocki has made several substantial factual admissions that frame the analysis of the Fourth Amendment claim. Specifically, Nawrocki agrees that on the evening in question, she and her mother voluntarily accompanied the Crestwood police officers to the police station, and the officers did not force Nawrocki or her mother to go with them. (Def. SF re Nawrocki ¶¶ 9-10, 12.) Nawrocki also concedes that she was never placed under arrest, and never felt like she was under arrest while she was at the police station. *(Id.* ¶ 16.) In this regard, while at the police station, Defendant never threatened to place Nawrocki under arrest nor put her in jail, and Nawrocki was never handcuffed, searched, or fingerprinted. *(Id.* ¶¶ 13, 15.) Nawrocki was questioned by Defendant, in the presence of a female police officer, for "five or ten minutes," about the

30

location of the gun Carillo allegedly used in the attempted murder. (*Id.* ¶ 14.) When she was done at the station—where she did not feel under arrest—a police officer drove her home. (*Id.* ¶¶ 14, 16.) Nawrocki also states that, at the time of the questioning, it was approximately 11 p.m. (*Id.* ¶ 9.)

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Amend. IV. The Seventh Circuit has emphasized that "[t]he Fourth Amendment prohibits unreasonable *seizures* not unreasonable, unjustified or outrageous conduct in general." *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992) (collecting cases; emphasis in original). A person is seized within the meaning of the Fourth Amendment only if a reasonable person in the subject's position would have believed she was not free to leave. *Id.* at 1332-33 (citation omitted). "[A] seizure requires not only that the reasonable person feel that [s]he is not free to leave, but also that the subject actually yield to a show of authority from the police or be physically touched by the police." *Id.* at 1333 (collecting cases); *accord, e.g.*, *United States v. Bradley*, 196 F.3d 762, 767 (7th Cir. 1999) ("A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, in some way restrained the liberty of a citizen.") (internal punctuation marks omitted). If an initial questioning by the government has begun on a voluntary basis, the government may continue questioning an individual or request to search that individual or his possessions, irrespective of whether law enforcement has any probable cause, so long as the police do not convey a message that compliance with their requests or questioning is required. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 435 (1991). To determine whether

an individual has been seized by a government officer in violation of the Fourth Amendment, the court asks first whether the individual was seized, and second, whether the seizure was unreasonable. *See Leaf v. Shelnutt*, 400 F.3d 1070, 1089 (7th Cir. 2005); *Dunn v. City of Elgin*, 347 F.3d 641, 648 (7th Cir. 2003).

As mentioned above, Nawrocki all but abandons her Fourth Amendment claim in her summary judgment response. (*See* D.E. 33 at 4 (asserting that Defendant's qualified immunity argument "misses the point" because Nawrocki's "claim is not as much for her wrongful detention as for the brutality of defendant's interrogation of a 13 year-old child").) Nawrocki principally relies on two cases in support of her argument that summary judgment is inappropriate. The first, *Grendell v. Gillway*, 974 F. Supp. 46 (D. Me. 1997), is the substantive due process case discussed above. That case is distinguishable, even as to the substantive due process issues, and does not assist Nawrocki's Fourth Amendment claim in any event.

The second case, *Irvin v. Kaczmaryn*, 913 F. Supp. 1190 (N.D. Ill. 1996), also does not provide a defense to summary judgment. In *Irvin*, three boys, including the thirteen and fourteen year-old plaintiffs, were walking through a municipal parking lot where a North Chicago police car was parked. *Id.* at 1195. The third boy, without saying anything to the plaintiffs, walked over to the police car and took a pack of chewing gum. *Id.* The incident was witnessed by a municipal employee, who immediately spoke to a police officer. *Id.*

The police officer "summon[ed]" the boys, telling them "come on, let's go" as he directed them into the police station. *Id.* The boys, including the two plaintiffs, then were photographed, fingerprinted, and individually searched—with each boy having to

stand and face the wall, whereupon an officer kicked his feet apart until he was in a spread stance. *Id.* at 1195-96. The boys then were interviewed and ultimately released. There also were allegations (and disputed factual issues) about whether the police physically roughed up the boys, purposefully broke one plaintiff's sunglasses, and subjected the plaintiffs to heated racial insults during the booking. *Id.* at 1196.

Under those facts, the district court readily concluded that the boys, including the plaintiffs, were arrested and that the police needed to have probable cause for such arrests. *Id.* at 1197. The district court also found that there were disputed facts as to whether the police had probable cause to detain the two plaintiffs, particularly because the municipal employee-witness allegedly quickly told the police that only the third boy was the gum-thief and did not say that either plaintiff had done anything wrong, either before or after the plaintiffs were arrested. *Id.* at 1198.

This Court takes no quarrel with the result of *Irvin*, but it is of no use to Nawrocki here because the facts of her case are materially distinguishable from the situation in *Irvin*. Ms. Nawrocki was not summoned into the police station; she agrees that she went voluntarily. When she arrived at the police station, she was not photographed, fingerprinted and searched, nor (although these points are not necessarily all legally germane for Fourth Amendment purposes) was she allegedly subject to racial epithets, physical abuse, or having her personal property destroyed. Instead, she admits that was never placed under arrest, as the Court readily found to be the case in *Irvin*, and Nawrocki further admits that never felt like she was under arrest while she was at the police station. (Def. SF re Nawrocki ¶ 16.) Under these circumstances, Nawrocki's citation of *Irvin* provides no basis to forestall summary judgment.

33

Moreover, and independently, Nawrocki has offered no persuasive argument that qualified immunity would not apply in any event. Nawrocki's sole argument in response to Defendant's qualified immunity claim is that her suit is not really about "wrongful detention" but rather is a substantive due process claim concerning the nature of the interrogation. (D.E. 33 at 4.) As explained above, the substantive due process argument has multiple flaws, and it is not a persuasive reason to forestall application of the qualified immunity defense to the Fourth Amendment claim. *See, e.g., Estate of Stevens,* 105 F.3d at 1174 ("Once a defendant has pleaded qualified immunity, the plaintiff has the burden to demonstrate the existence of the clearly established constitutional right.") (citation omitted).

Finally, the Court notes Ms. Nawrocki's contention that she was not told at the police station that she was free to leave. That may be true, but Nawrocki offers no authority for the proposition that the police must inform a person who has indisputably come to the station on a voluntary basis that she is still free to leave. (Ms. Nawrocki does not contend that she ever even *asked* if she was free to go, much less that the police ever told her she was not.) The Court also takes note of the fact that Ms. Estrada, Ms. Nawrocki's mother, had been arrested, but that is neither the fault of the police nor Ms. Nawrocki; Ms. Nawrocki also offers no authority to suggest that the police were under an obligation to tell Ms. Nawrocki that she was free to leave just because her mother's various false and suspicious statements justified her arrest.[17] *Accord Estate of Stevens,* 105 F.3d at 1174.

---

[17]    It is also worth noting that the police would almost surely would have been acting irresponsibly had they encouraged or even allowed the thirteen year-old Nawrocki to leave the station alone that night, at what Ms. Nawrocki estimates to be at least 11:00 p.m. In fact, under Seventh Circuit precedent, although the Court certainly need not pass definitively on the issue,

## IV. Conclusion

Defendant's motions for summary judgment are granted in part and denied in part. (D.E. 23; D.E. 29.) With respect to Estrada's claims, summary judgment is granted as to the false arrest claim and denied as to the claim of unlawful detention. (D.E. 29.) The Court grants Defendant's motion for summary judgment (D.E. 23) as to Nawrocki's Fourth Amendment claim, the only claim she properly advances in the Complaint. The Defendant's motions to strike (D.E. 43 and 45) are resolved as reflected herein.

So ordered.

_Mark Filip_

Mark Filip
United States District Judge
Northern District of Illinois

Date: _6-19-06_

---

there potentially would be a non-frivolous basis to claim that the police would had violated Nawrocki's constitutional rights if they had allowed her to leave the station alone at 11 p.m. after bringing her there and harm had occurred—*see generally, e.g., White v. Rochford*, 592 F.2d 381, 382 (7th Cir. 1979); *see also Kniepp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996)—as opposed to taking her safely home to her residence, as the police indisputably did.